R. Jeremy Adamson (12818)
Tucker F. Lewis (17793)
**BUCHALTER**
**A Professional Corporation**
60 E. South Temple, Suite 1200
Salt Lake City, UT 84111
(801) 401-8625
Email: jadamson@buchalter.com
Email: tlevis@buchalter.com

*Attorneys for Court-Appointed Receiver Chad Pehrson*

---

**IN THE UNITED STATES DISTRICT COURT OF UTAH,**
**NORTHERN DIVISION**

| | |
|---|---|
| CHAD PEHRSON, as Receiver, <br><br> Plaintiff, <br><br> v. <br><br> BANK OF UTAH, a Utah corporation, <br><br> Defendant. | **FIRST AMENDED COMPLAINT** <br><br> **(Ancillary to Case No. 1:22-cv-00135-RJS-DBP – General Order 23-009)** <br><br> Case No.: 2:25-cv-00462-RJA-DBP <br><br> Judge: Robert J. Shelby <br><br> Magistrate Judge: Dustin B. Pead |

Plaintiff Chad S. Pehrson, as the court-appointed Receiver in Case No. 1:22-cv-00135 pending in the United States District Court for the District of Utah ("Plaintiff' or "Receiver") hereby alleges, avers, and complains of Defendant Bank of Utah ("Bank of Utah") as follows:

**SHORT SUMMARY OF ACTION**

1.      Plaintiff Chad Pehrson (the "Receiver") is acting in his capacity as Court-appointed Receiver in Case No. 1:22-cv-00135 pending in this District, over the assets of the Estate of Stephen Romney Swensen, which include the assets of WS Family, IP, LLC, Crew Capital Group, LLC ("Crew Capital"), and Swensen Capital, LLC (collectively, the

"Receivership Defendants"). The Receiver brings this case to recover funds transferred from Crew Capital and Swensen to Bank of Utah.

2.      Bank of Utah received proceeds derived from an illegal Ponzi scheme implemented by Stephen Romney Swensen. The Bank did not provide reasonably equivalent value for what it received and must return these funds to the Receiver for the benefit of the defrauded investors.

3.      The wrongfully received proceeds include administrative fees paid to Bank of Utah, from Swensen, for investors' self-directed IRAs at the Bank of Utah. The Receiver files this action to recover all such proceeds, including any assets or benefits obtained using those funds.

4.      In furtherance of the Ponzi scheme, Swensen instructed investors to open and fund self-directed individual retirement accounts ("IRAs") with Bank of Utah. After investors executed a Letter of Authorization, Swensen directed Bank of Utah to transfer the funds to Crew Capital's account with Wells Fargo ("Crew Capital Account"). Bank of Utah would then charge a quarterly administration fee for each Crew Capital investor with an account at Bank of Utah. Instead of charging these fees to the account or investors, Bank of Utah would submit quarterly invoices for all Crew Capital investors directly to Swensen, who would remit payment to Bank of Utah from accounts he controlled and funded with investor money.

5.      Bank of Utah received payments from Swensen totaling at least $811,806.37, all funded with investor monies from accounts controlled by Swensen and Crew Capital.

2

## **PARTIES, JURISDICTION, AND VENUE**

6.     On August 8, 2023, the Receiver was appointed by this Court to identify, collect, and preserve the estates of the Receivership Defendants for the benefit of the estate's creditors, including over fifty defrauded investors.

7.     The Receiver brings this action to recover the amounts and assets transferred to Bank of Utah, which were fraudulently obtained and belong to the Receivership Defendants.

8.     The Receiver has been granted authority to pursue fraudulent transfer actions.

9.     Bank of Utah is a Utah corporation that does business, including providing personal trust services, throughout the State of Utah.

10.     This Court has jurisdiction over the subject matter of this action because it is ancillary to the SEC Action and the appointment of the Receiver by this Court.

11.     Bank of Utah has sufficient minimum contacts with Utah such that personal jurisdiction is appropriate in this Court. Personal jurisdiction is also proper pursuant to 28 U.S.C. §§ 754, 1692.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1391(b).

## **THE RECEIVER, STANDING, AND STATUS OF SEC ACTION**

13.     On October 14, 2022, the Securities and Exchange Commission ("SEC") filed a complaint against the Receivership Defendants in the United States District Court for the District of Utah, Case No. 1:22-cv-00135-RJS-DBP (the "SEC Action").[1]

---

[1] *See* Exhibit A.

14. The SEC Action alleged that the Receivership Defendants fraudulently solicited over $29 million from investors, whom they tricked into investing in Crew Capital, which was allegedly co-managed by a reputable firm and purported to guarantee investors a minimum annual return.

15. The SEC alleged that the Receivership Defendants did not invest in any securities. Instead, they misappropriated essentially all investor funds to make Ponzi scheme payments to other investors and to pay for Swensen's personal expenses, such as real estate, vehicles and multiple private aircrafts, and living expenses for him and his family.

16. Due to the Ponzi scheme, Bank of Utah received, either directly or indirectly, approximately $811,806.37 from the Receivership Defendants. The transfers to Bank of Utah furthered the fraudulent investment scheme and were not supported by reasonably equivalent value.

17. On August 8, 2023, the Court entered an Order Appointing Receiver and Staying Litigation (the "Appointing Order"), appointing Mr. Pehrson as permanent Receiver.[2]

18. Pursuant to the Appointing Order, the Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located.[3]

19. The Receiver is further authorized to take immediate possession of all real property of the Receivership Defendants, wherever located.

20. The Receiver is further authorized to initiate suit to recover all property of the Receivership Defendants in the possession of third parties.

---

[2] *See* Exhibit B.
[3] *See* Exhibit B.

**THE FRAUDULENT PONZI SCHEME**

21.     Stephen Romney Swensen ("Swensen") was a registered representative of broker- dealers Summit Brokerage Services, Inc. (March 2010 to June 2014), Allegis Investment Services, LLC (July 2014 to May 2018), and J.W. Cole Advisors, Inc. (May 2018 to June 2018), and Wealth Navigation Advisors (June 2018 to June 2022).  In the course of the Ponzi Scheme, the Receivership Defendants made material misrepresentations and omissions, misappropriated investor funds, and committed fraud.

22.     The Receivership Defendants' purpose was to generate illicit financial benefits for Swensen, from which Bank of Utah benefitted.

23.     From at least July 2011, Swensen began offering and selling investments in Crew Capital. Swensen approached his customers and clients during meetings, during which he provided advice on their investment portfolios and retirement plans. He suggested that they include Crew Capital in their investment and retirement strategies.

24.     Swensen informed investors that Crew Capital was a safe investment fund offering guaranteed minimum annual returns of 5%. He claimed that Crew Capital could provide their retirement income and described it as a safe option for their portfolios.

25.     Swensen also told some investors that they would invest in a fund at the Bank of Utah, promising the same guaranteed minimum returns of 5% to 10%. He assured them that this Bank of Utah fund was also a safe option for their portfolios. However, there was no such fund at the Bank of Utah. After investors deposited their money at the Bank of Utah, Swensen promptly transferred these funds to Crew Capital's account at Wells Fargo Bank.

26.     Swensen also provided some investors with written documentation about the fictitious Crew Capital investment, falsely portraying Crew Capital as an "actively

5

managed portfolio" investing in senior secured floating rate loans and options on the S&P index. Some documents falsely claimed that Pacific Investment Management Company, LLC ("PIMCO") was the subadvisor to Crew Capital and that Crew Capital had been established in 1997. Other documents incorrectly stated that Crew Capital's "share class inception" date was April 29, 2011.

27.     Swensen gave certain investors falsified PIMCO documents to create the impression that PIMCO and Crew Capital jointly managed a "Senior Floating Rate Fund." One document claimed to be an annual report of the "Crew Capital Group / PIMCO Funds," stating that a collaborative fund existed with total assets of $318,897,000. However, PIMCO had no association whatsoever with Swensen or Crew Capital.

28.     Swensen created a website for Crew Capital with the help of a web developer and a graphic designer. Initially named Capital Cooperative, the website was found at www.capitalcoop.com. Later, when it became Crew Capital in 2015, the website changed to www.crewfunds.com. These sites claimed that Crew Capital could remove market risk, stating: "Do you want to eliminate market turbulence? Talk to your financial advisor about how." Swensen gave investors login details for these sites, where they could see their account balances, including fake returns. The accounts supposedly showed daily growth of the guaranteed 5% yearly returns, with an extra lump sum payment of up to another 5% annual return on the anniversary of their investment. However, these statements and claims were fabricated.

29.     Swensen managed a bank account at Wells Fargo Bank under the name of Crew Capital. He had exclusive control over the account and used it to pool investor funds from Crew Capital.

30.     Swensen acquired investor funds by instructing investors at different times to write personal checks to Crew Capital, obtaining cashier's checks payable to Crew Capital, wiring funds directly to Crew Capital's accounts at Wells Fargo Bank, and/or signing documents authorizing the transfer of funds into Crew Capital's account from their other investment or retirement accounts.

### AMOUNTS RECEIVED BY BANK OF UTAH

31.     Through its Personal Trust Department, Bank of Utah offers self-directed individual retirement accounts ("IRAs") that allow customers to invest in "an almost unlimited array of possibilities."

32.     An IRA account, including self-directed IRAs, must be held by a regulated financial institution (e.g., bank, qualified brokerage firm, insurance company) in a custodial capacity for the benefit of the account holder.

33.     A self-directed IRA permits the account holder to invest in assets other than savings accounts, brokerage accounts, or annuities that are offered by the custodial financial institution.

34.     The Bank conducted all its actions alleged herein either intentionally, willfully or with gross negligence.

**A.     Bank of Utah Maintained Longstanding Relationship with Swensen and Crew Capital**

35.     From 2010 through June 2022, Bank of Utah opened approximately thirty-five (35) customers' self-directed IRA accounts invested in Crew Capital Group at the Bank. The

7

amounts invested through the Bank's IRAs were more than $15,000,000 of qualified retirement assets.

36.     The Bank's IRA customers were primarily elderly individuals, or retirees, with whom Swensen had long-standing personal relationships as their financial advisor.

37.     Importantly, the Bank knew that Swensen was purporting to act as the customers' trusted "financial advisor" and directing them to open their IRA accounts at the Bank.

38.     Throughout the entire time, Swensen worked directly with three different Trust Department Officers at the Bank: Jodie Buckner (Vice President and Senior Trust Officer), Kimberly Taylor (Trust Officer) and Jana Coley (Trust Officer) (collectively, the "Bank Officers").

39.     From 2010 through 2022, the Bank Officers provided Swensen with "packets" of the Bank's official forms and promotional materials, including electronic versions of the forms (the "Official Forms"), so that he could meet with potential new customers for the Bank to solicit, open and fund self-directed IRAs at the Bank.

40.     The Bank Officers knew that Swensen was using the Bank's Official Forms to sign up potential customers to use the Bank's IRAs as investment vehicles.

41.     The Bank Officers knew that the Bank would be paid administrative fees for each account the Bank opened and that the Bank Officers, individually, would receive "incentive compensation" for each new IRA that Swensen brought to the Bank.

42.     Prior to opening and funding the customers' IRAs with the Bank, the Bank Officers did not meet with, or communicate with, any of the Bank's customers.

43.     Instead, the Bank Officers relied upon Swensen to meet with the potential

8

customers, present the Bank's Official Forms, describe the operation of the Bank's IRA and otherwise solicit the customers to use the Bank's IRA product for their investments.

44.    Swensen also took photocopies of the customers' drivers licenses and sent copies to the Bank together with the signed copies of the Bank's Official Forms for the Bank to use to transfer its customers' funds from other, legitimate investments to the Bank so the Bank could open their accounts without ever meeting its customers.

**B.    Bank of Utah's Trust Officers Thought Swensen Was Operating a Ponzi Scheme and Knew that Swensen Controlled "Crew Capital"**

45.    Bank of Utah Vice President and Senior Trust Officer Jodie Buckner ("Buckner") stated that, when she first started working with Swensen, she "questioned" what he was doing, so she "showed up" at Swensen's office to "check it out and make sure it was legit." *See* Audio Transcript at 20:12-20, Ex. C.  She claimed that she determined from that early meeting with Swensen that it was "legit."  *Id.*

46.    Over time, however, Buckner came to believe that Swensen was operating a Ponzi scheme with the Bank's customers' IRA retirement savings.  *See* Audio Transcript at 27:15-20, Ex. C.

47.    Buckner stated that she "thought" Swensen was operating a Ponzi scheme and "discussed it" with Swensen "a couple of times." *Id.*

48.    Buckner also knew that Crew Capital was not a third-party investment and that Swensen, in fact, was Crew Capital. *Id.* at 3:5-11.

49.    Buckner understood that Swensen had told the Bank's IRA customers that he was "investing" their IRA funds in Crew Capital.

50.    The Bank's customers, however, were unaware that Swensen was, in fact,

9

"Crew Capital" and that they were transferring their funds to his control through their IRAs, as opposed to being delivered to a legitimate third-party investment.

51.     Despite the red flags she observed and the concerns she raised with Swensen on several occasions, Buckner never reported her concerns to customers of the Bank, federal or state regulators or law enforcement.

52.     To the extent that Bank of Utah did not have actual knowledge of Swensen's fraud and the Bank of Utah's participation in that fraud, it was grossly negligent. Any investigation would have revealed substantial evidence of a Ponzi scheme within the Bank of Utah's own documents, including, but not limited to the following:  (1) the lack of sufficient underlying documentation of an "investment" when the investors' IRAs were opened and their funds were transmitted from Bank of Utah to Crew Capital's account; (2) Swensen's false and undocumented claims that Crew Capital was issuing "promissory notes" to reimburse investors for significant penalties caused by liquidating their retirement annuities at other institutions; (3) Crew Capital's payment of the Bank of Utah's custodial fees; and (4) the lack of proper authorizations for Swensen to exercise authority and control over the investors' IRAs.

53.     Instead, for more than a decade, Bank of Utah continued opening new IRAs for Swensen and transferring its customers' retirement savings to Swensen at his "Crew Capital" account, which he maintained at Wells Fargo Bank.

54.     For this entire time, Bank of Utah knew that (1) Swensen was acting in a fiduciary capacity as the customers' trusted financial advisor *and* (2) operating and controlling their IRAs' purported "investment" in Crew Capital at Wells Fargo Bank, thereby making all the "IRAs" at the Bank invalid and *void ab initio.*

55.    The Bank also ignored multiple indicators of fraud and continued servicing IRAs invested solely in an entity controlled by Swensen without performing even minimal diligence, despite the clear risk to investors.

56.    After improperly opening the IRA accounts, the Bank, as Custodian, also (1) failed to obtain proper documentation of the underling Crew Capital "asset" allegedly held by the IRA and (2) failed to report proper annual valuations of the customers' IRAs to the Internal Revenue Service because the Bank used "values" that were provided to it by Swensen (whom the Bank knew was not at "arm's length" from either the customers or the purported "Crew Capital" investment).  As a result, the Bank also failed to deliver the services it purported to provide as "Custodian" for the IRA accounts.

### C.    The Bank Agreed that Crew Capital Could Pay the Bank's Fees if the Customers Used the Bank for their IRAs

57.    Buckner also knew that, when Swensen was soliciting potential customers for the Bank's IRAs, he was promising those customers that the Bank would accept payment of their IRA account fees from Crew Capital *if* the customers agreed to use the Bank for their IRAs.  Audio Transcript, 19:22-24 ("He just promised his clients that he – they would pay their annual fee for them if they came to the bank"), Ex. C.

58.    The Bank and Swensen knew and understood that Crew Capital would pay the customers' IRA account fees.

59.    To implement that arrangement, the Bank invoiced Crew Capital for its fees for the customers' IRAs (that were, as alleged *supra*, fraudulent and void) and Crew Capital paid those fees.

60.    Under the arrangement with Swensen, Bank of Utah issued quarterly statements

11

to Swensen that identified each Crew Capital customer's custodial account fee. Swensen would then make a single, lump sum payment to Bank of Utah for all the custodial account fees.[4] Bank of Utah knew this arrangement was highly irregular, as custodial IRA fees are typically charged directly to each account holder.

61.    The Bank also knew that Crew Capital's alleged "payments" for the Bank's customers' IRAs came from the same Wells Fargo account where the Bank also transferred its customers' funds to Swensen's control at Crew Capital.

62.    The Bank received hundreds of thousands of dollars in fees from Crew Capital for its customers' (fraudulent and void) IRAs at the Bank and the Bank has retained those fees.

63.    Swensen, acting through Crew Capital and with control over the Receivership Defendants' accounts, directed payments to Bank of Utah totaling at least $811,806.37. Based on available records, the specific payments to Bank of Utah are identified as follows:

    a.    On November 16, 2011 $500,000.00.

    b.    On May 1, 2018 $13,662.50.

    c.    On August 6, 2018 $16,412.50.

    d.    On November 8, 2018 $16,412.50.

    e.    On February 8, 2019 $16,412.50.

    f.    On May 8, 2019 $16,162.50.

    g.    On August 6, 2019 $16,162.50.

    h.    On November 6, 2019 $17,045.82.

    1.    On February 19, 2020 $10,000.00.

---

[4] Examples of the invoices remitted by Bank of Utah to Swensen for the IRA Administration Quarterly Fees are attached as Exhibit D.

J.      On March 25, 2020 $7,233.00.

k.      On June 1, 2020 $25,609.19.

l.      On August 24, 2020 $22,240.80.

m.      On September 11, 2020 $123.54.

n.      On November 9, 2020 $22,091.75.

o.      On February 10, 2020 $22,725.27.

p.      On February 11, 2021 $180.00.

q.      On May 20, 2021 $22,682.300.

r.      On August 20, 2021 $22,683.00.

s.      On March 25, 2022 $22,683.00.

64.     Upon information and belief, the Receivership Defendants transferred funds to Bank of Utah with improper intent, including intent to hinder, delay, or defraud the rightful owners of the funds. At the time of each transfer, or as a result thereof, the Receivership Defendants were insolvent, became insolvent, or were engaged in business for which their remaining assets were unreasonably small in relation to their obligations.

65.     Bank of Utah ultimately received the benefit of at least $811,806.37 payments received from the Receivership Defendant's Crew Capital Wells Fargo account.

### BANK OF UTAH'S SELF-DIRECTED IRA CUSTODIAL AGREEMENTS

66.     The Bank's IRA customers all entered what they believed was an agreement with Bank of Utah to have the Bank act as a "custodian" for a self-directed individual retirement account ("IRA") at the Bank.

67.     IRAs are accounts with deferred tax benefits.

68.     The fees Crew Capital paid to Bank of Utah from the customers' funds were

purportedly compensation for Bank of Utah's services as a custodian for the IRAs.

69.    Federal law requires that an investment held in an IRA meet certain requirements to preserve the preferential deferred tax benefits for the account.

70.    If the IRA's investment violates those requirements, federal law treats the IRA as a non-qualified bank "account" and all the tax benefits that are the purpose of the IRA are lost.

71.    The IRA must avoid transactions with Disqualified Persons, including fiduciaries *(e.g.,* paid investment advisors or persons exercising discretion for the disposition of assets) for the owner of the account. *See* Internal Rev. Code§ 4975(e)(2), (3).

72.    Swensen, as a paid investment advisor with a fiduciary duty to the investors in Crew Capital and who the bank allowed to have discretionary authority over the Crew Capital accounts, was a Disqualified Person under Internal Rev. Code§ 4975(e)(2), (3). Bank of Utah was aware, from the inception of its relationship with each of the Customers that Swensen was each such Customer's advisor who exercised ownership control and discretionary authority over the Crew Capital accounts and, therefore, a Disqualified Person under the Internal Revenue Code.

73.    Bank of Utah was aware that Crew Capital was an account or investment that was owned, sponsored, and controlled by Swensen.

74.    There are no exceptions under Internal Rev. Code § 4975 that would allow Bank of Utah, as custodian, to establish and fund a valid IRA with any of the Customers through Swensen and Crew Capital.

75.    Further, as custodian, Bank of Utah was responsible for taking and holding title

to the customers' investments in Crew Capital. However, Bank of Utah was not party to, and did not execute, agreements conveying title of the customers' accounts at Crew Capital to Bank of Utah. As such, Bank of Utah wholly failed to fulfill one of its fundamental roles as a custodian of those IRA accounts.

76.     Each such customer's "Custodial Agreements" with Bank of Utah are void because they lack consideration and failed for their essential purpose to create a self-directed individual retirement account under federal law.

77.     In addition, the Bank of Utah employee who executed many of those Custodial Agreements with the investors in Crew Capital, thought that those customers' retirement assets were being invested and used in Swensen's criminal enterprise known as a Ponzi scheme.

78.     As a result, the custodial agreements failed in their essential purpose because Bank of Utah did not verify, hold, document, or safeguard any actual investment asset and relied entirely on information provided by Swensen, the promoter controlling the investment. As such, these agreements were *void* or *void ab initio* because they were illegal under the laws of the State of Utah.

79.     There was no consideration supporting any payments the Bank of Utah received from Crew Capital from the customers' funds.

80.     Bank of Utah received the custodial fee payments through conduct that was intentionally wrongful, reckless, or at least grossly negligent.

## FIRST CLAIM FOR RELIEF
### (Avoidance of Fraudulent Transfers)

81.     The Receiver hereby incorporates the foregoing paragraphs of this

Complaint herein by this reference.

82. The Receivership Defendants operated Crew Capital as a Ponzi scheme.

83. The Receivership Defendants paid Bank of Utah at least $811,806.37 from an account controlled by Swensen and Crew Capital. At the time of these transfers, the Receivership Defendants were insolvent, became insolvent as a result of the transfers, or operating with assets unreasonably small in relation to their obligations. Bank of Utah did not provide reasonably equivalent value in exchange for the funds received.

84. Because the Receivership Defendants operated a Ponzi scheme, the transfers to Bank of Utah are presumed to have been made with the intent to hinder, delay, or defraud creditors.

85. Bank of Utah ignored clear indicators—including the irregular bulk-fee payment structure, Swensen's unilateral control of the source accounts, and the absence of any documented investment—that the transfers were not made in the ordinary course and were connected to fraudulent conduct.

86. Pursuant to Utah's Uniform Voidable Transactions Act, specifically Utah Code Ann § 25-6-202 and § 25-6-203, the Receiver may avoid and recover the transfers made to Bank of Utah. The transfers were made with actual intent to hinder, delay, and defraud creditors, and Bank of Utah did not provide reasonably equivalent value to any Receivership Defendants for the amounts the Receiver seeks to avoid.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

87. The Receiver hereby incorporates the foregoing paragraphs of this Complaint herein by this reference.

16

88.     The transfers to Bank of Utah were comprised of property of the Receivership Defendants and were made by the Receivership Defendants in furtherance of the fraudulent scheme.

89.     The transfers to Bank of Utah conferred a benefit on Bank of Utah.

90.     Bank of Utah accepted the benefits conferred by the Receivership Defendants.

91.     Allowing Bank of Utah to retain the transfers at issue in this lawsuit would unjustly enrich the Bank and be inequitable.

92.     Bank of Utah did not provide reasonably equivalent value to the Receivership Defendants in exchange for the transfers, which were made using funds obtained from defrauded investors. Allowing Bank of Utah to retain these funds would unjustly enrich it at the expense of the victims of the Ponzi scheme, who are the rightful owners of the funds.

93.     Absent the return of the transfers, the Receivership Estate would be damaged by Bank of Utah's unjust enrichment and may have no adequate remedy at law.

94.     Bank of Utah must disgorge the amount of the transfer.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the Receiver requests judgment against Defendant as follows: 1. recovering the amount of $811,806.37 in transfers; 2. Awarding prejudgment interest, attorney's fees, and costs; 3. Granting such other and further relief as the Court deems just and proper.

DATED November 18, 2025.

**BUCHALTER**
**A Professional Corporation**

*/s/ R. Jeremy Adamson*
R. Jeremy Adamson
Tucker F. Levis
*Attorneys for Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that November 18, 2025, a true and correct copy of the **First Amended Complaint** was served via electronic-filing system to the following:

**Matthew J. Orme**
DENTONS DURHAM JONES & PINEGAR PC
111 S MAIN ST STE 2400
PO BOX 4050
SALT LAKE CITY, UT 84110-4050
Fax: 801-415-3500
Email: matt.orme@dentons.com
*Attorney for Defendant*

**BUCHALTER**
**A Professional Corporation**

*/s/ R. Jeremy Adamson*
R. Jeremy Adamson
Tucker F. Levis
*Attorneys for Receiver*